T. Henderson ~~F250~~
Paper No.       F251

FOR PUBLICATION IN FULL

U. S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

---

Trademark Trial and Appeal Board

---

Bureau National Interprofessionnel Du Cognac
v.
International Better Drinks Corporation

---

Opposition No. 72,088 to application Serial No. 514,043
filed December 17, 1984.

---

Mary L. Kevlin and Arthur J. Greenbaum for Bureau National
Interprofessionnel Du Cognac.

Hubbard, Thurman, Turner & Tucker for International Better
Drinks Corporation.

---

Schieffelin & Co.
v.
International Better Drinks Corporation

---

Opposition No. 72,105 to application Serial No. 514,043
filed December 17, 1984.

---

Townley & Updike for Schieffelin & Co.

Hubbard, Thurman, Turner & Tucker for International Better
Drinks Corporation.

---

Before Sams, Rice and Simms, Members.

Opinion by Rice, Member:

An application was filed by International Better
Drinks Corporation, now by change of name IBDL, Inc. to
register the mark "COLAGNAC" for liqueur, use since May 10, .

1984 being asserted.[1]

Registration was opposed by Bureau National Interprofessionnel Du Cognac (hereafter "opposer Bureau"), in Opposition No. 72,088, which asserted that it is an interprofessional association having the status of a corporate body, created by decree in 1941 under the authority of the French Ministry of Agriculture and Ministry of Economy and Finance to oversee the protection of the term "COGNAC" (as a designation for a type of brandy) and the interests of the "COGNAC" trade, namely, the vintners, trading firms and various auxilliary professions. As grounds for opposition, opposer Bureau asserted (in its amended notice of opposition) essentially that under United States law, the designation "COGNAC brandy" may only be applied to brandy entitled to the designation under French laws and regulations; that under French law, the "COGNAC" designation may only be applied to brandy produced within the Cognac region of France, the boundaries of which are defined by French law; that for many years, the "COGNAC" trade which opposer Bureau represents has used the designation "COGNAC" to indicate the grape brandy distilled from wines produced from grapes grown in the Cognac region of France in accordance with French laws and regulations, and has exported to the United States substantial quantities of "COGNAC" brandy; that applicant's mark "COLAGNAC" consists of

(1) Serial No. 514,043, filed December 17, 1984.

deceptive matter in that it falsely suggests that applicant's liqueur products bearing the mark emanate from the Cognac region of France and are, or contain, "COGNAC" brandy; and that applicant's mark, when applied to liqueur, so resembles the designation "COGNAC" as to be likely to cause confusion, mistake, or deception. Opposer Bureau also asserted, as additional grounds for opposition, that applicant has abandoned the mark "COLAGNAC" through uncontrolled licensing and through nonuse (by applicant and its licensees) since September 27, 1984 with no intent to resume use.

Applicant, in its answer to the amended notice of opposition, admitted that under United States law, the designation "COGNAC brandy" may only be applied to brandy entitled to the designation under French laws and regulations; that "COGNAC" brandy imported into the United States in bottles may not be released from U.S. Customs unless accompanied by a certificate from the authorized French government official that the product is "grape brandy distilled in the Cognac region of France and entitled to be designated as 'Cognac' by the laws and regulations of the French government"; and that on September 25, 1984, applicant entered into an agreement with George Golman [referred to in the notice of opposition, but not in the answer, as a license agreement], which agreement has been terminated. Applicant's answer otherwise denied the salient allegations contained in the notice of opposition. In addition, applicant asserted affirmatively that its product is clearly marked to indicate that it is a cola-flavored liqueur

3

produced in Spain; that the designation "COGNAC" is merely descriptive of geographic origin and thus is entitled to no protection; and that opposer Bureau is guilty of laches and estoppel because of its failure to object to a registration for "COLAGNAC" issued to applicant under the Trademark Act of 1938 of Great Britain and Northern Ireland.

The application was also opposed by Schieffelin & Co. (hereafter "opposer Schieffelin"), in Opposition 72,105, essentially on the grounds (as stated in an amended notice of opposition) that under a Standard of Identity established by the Bureau of Alcohol, Tobacco and Firearms ("BATF"), "COGNAC" or "COGNAC brandy" has been defined as "grape brandy distilled in the Cognac region of France, which is entitled to be so designated by the laws and regulations of the French government"; that for many years opposer Schieffelin and its predecessor have been engaged in the importation and distribution of a variety of "COGNAC" products which, in conformity with the Standard of Identity established by the BATF, are made from grape brandy distilled in the Cognac region of France; and that because of its similarity to the term "COGNAC," applicant's mark "COLAGNAC" is deceptive and deceptively misdecriptive as applied to applicant's liqueur, which is not made from grape brandy distilled in the Cognac region of France. The notice of opposition also includes allegations of abandonment through nonuse with no intent to resume use and through uncontrolled licensing.

4

Applicant, in its answer to this opposition, admitted the allegation concerning the BATF's "COGNAC" Standard of Identity; that for many years opposer Shieffelin and its predecessor have been engaged in the business of importing and distributing alcoholic beverages, including "COGNAC" brandy; and that on September 25, 1984, applicant entered into an agreement with George Golman [again referred to in the notice of opposition, but not in the answer, as a license agreement], which agreement has been terminated. Applicant denied the remaining salient allegations of the notice of opposition, and made the same affirmative assertions as in the first opposition.

Because of the similarities in the issues involved in the two proceedings, they were consolidated upon motion filed by the two opposers, with the consent of applicant. The record in the consolidated proceedings consists of the pleadings; the file of applicant's application; portions of the discovery deposition of applicant's president, Mr. Herman Philipson, Jr., taken by opposer Bureau and relied upon by both opposers pursuant to Trademark Rule 2.120(j)(1) and (3); other portions of the same deposition, relied upon by applicant (without objection by either opposer) under Trademark Rule 2.120(j)(4); portions of certain publications, made of record by opposer Bureau pursuant to Trademark Rule 2.122(e); the testimony upon written questions of Jean Graille, adduced by opposer Bureau; the affidavit testimony of Gloria Carroci (offered by opposer Bureau), Clinton Rodenberg (offered by opposer Schieffelin) and Herman Philipson, Jr. (offered by applicant), all made of

record by stipulation of the parties pursuant to Trademark Rule 2.123(b); and the rebuttal testimony, by Trademark Rule 2.20 declaration, of Jean Graille (offered by opposer Bureau), made of record by similar stipulation of the parties. Only opposers have briefed the issues before us.

The evidence of record establishes that by French law, brandy may be called "COGNAC" only if it comes from certain defined geographic areas surrounding the French town of Cognac, and only if it meets certain other requirements as to type of grape, methods of distillation, aging, etc. The Cognac region has become famous as the place where "COGNAC" brandy is produced, and "COGNAC" brandy itself enjoys a world-wide reputation as a superior and prestigious quality brandy. In the United States, pursuant to regulations promulgated by the BATF, the designation "COGNAC brandy" may be used only on brandy entitled to bear the designation under French law. "COGNAC" brandy accounts for 90% of the brandy imported into the United States. Further, as noted above, applicant has admitted that "COGNAC" brandy imported into the United States in bottles may not be released from U.S. Customs unless accompanied by a certificate from the authorized French official that the product is "grape brandy distilled in the Cognac region of France and entitled to be designated as 'Cognac' by the laws and regulations of the French government."

Opposer Bureau is a French trade association created by French decree in 1941 to oversee the production and sale of "COGNAC" brandy and to protect (including by court action, if

necessary) the reputation and significance of the designation "COGNAC" as an appellation of origin for brandy. Thus, the Bureau prepares all regulations relating to the purchase, distillation, trade, stocking, and sale of wines and brandies of the Cognac region; is empowered to "supervise and guarantee the right to the appellation of origin 'COGNAC'"; controls and keeps account of the quantities as well as the quality of "COGNAC" brandies; issues aging and origin certificates; plays an important role with respect to the "acquit Jaune d'Or" certificate, a movement certificate which will not be issued (by the French tax administration) for "COGNAC" brandy unless the shipper is able to present a transfer voucher from opposer Bureau certifying that opposer Bureau has verified the shipper's product stocks; takes actions to protect and make known the special qualities of "COGNAC" brandy; etc. As part of its latter duty, opposer Bureau has established the Cognac Information Bureau ("CIB") in the United States to disseminate information about the high quality and uses of "COGNAC" brandy and to otherwise promote such brandy to the American people. The promotional efforts of the CIB have been on a significant scale and have utilized a variety of media and activities. Opposer's expenditures for CIB promotional activities in the United States during the recent period covering 1982-1986 amounted to a total of more than $1,300,000, with additional funds having been expended in years prior thereto. In 1985 alone, CIB's promotional activities resulted in nearly 300,000,000 impressions on behalf of "COGNAC" brandy. "COGNAC"

7

brandy has been imported into the United States for at least two centuries. During each of the years 1980, 1981 and 1982, approximately 25,000,000 bottles of "COGNAC" brandy were imported into the United States. Imports thereof increased to nearly 26,000,000 bottles in 1983 and nearly 30,000,000 bottles in 1984.

Since 1934, opposer Schieffelin has been the exclusive United States importer and distributor of "COGNAC" brandy produced by Jas. Hennessy & Co. of Cognac, France. The goods are sold under the mark "HENNESSY", and the labels for the goods also include prominent use of the "COGNAC" designation. All of the "COGNAC" products sold by opposer Schieffelin in the United States are genuine "COGNAC" products, as defined by French law, and each shipment of such products imported by opposer Schieffelin is accompanied by a certificate of authenticity endorsed by opposer Bureau. Opposer Schieffelin's "COGNAC" products are sold to consumers nationwide in retail liquor outlets and in bars and restaurants. Opposer Schieffelin has devoted substantial resources to promoting and publicizing "COGNAC" brandy through a variety of media. During the four years prior to September of 1986, opposer Schieffelin's total expenditures for this purpose exceeded $26,000,000. During the same period, opposer Schieffelin's total sales of "COGNAC" brandy amounted to more than $290,000,000.

The record also shows that although "COGNAC" brandy is traditionally thought of as a drink for the conclusion of a meal or an evening, increasingly, Americans are drinking it as a

8

cocktail, throughout a meal, or on any occasion when alcoholic refreshment is desired. When "COGNAC" brandy is used in a cocktail, it may be mixed with plain water, club soda or seltzer; cream and creme de cacao (to make a brandy alexander); fruit juice; creme de menthe; vermouth; soft drinks such as cola or ginger ale; wine coolers; etc. It is also used in punches and in cooking.

Applicant is a domestic corporation formed in January 1979 under the name International Better Drinks Corporation. Until approximately January 1, 1985, applicant was engaged in the business of importing alcoholic beverages into the United States. One product which applicant had made in Spain to its own order and then imported was a cola-flavored liqueur, the primary ingredients of which were cola and Spanish brandy. Applicant selected the mark "COLAGNAC" for the product. In February of 1984, applicant ordered 100 cases of the "COLAGNAC" product from its Spanish supplier. Applicant's first sale of the product in the United States was made in May of 1984, when applicant sold 99 cases of "COLAGNAC" cola liqueur to a retail liquor store in Texas. Although the record does not reveal what success the retail store had in selling the product, the record does indicate that the store ran one newspaper ad featuring this and other products. Also in the month of May 1984, applicant sold one bottle of the product to a distributor in Washington, D.C. In September of 1984, applicant sold another bottle of the product to a distributor in New York. The sales of the single bottles of the product to these two

distributors were made to them as samples, with the hope that the distributors would order additional quantities. However, applicant never received any further orders for the product from any of its three customers; in fact, applicant never made any other sales of the product in the United States.

In September of 1984, applicant sold the principal assets of its alcoholic beverage business, including the company name, "International Better Drinks Corporation", to a Mr. George Golman, and applicant changed its own name to IBDL, Inc. The sales agreement also included a license to Mr. Golman of the exclusive right to use the mark "COLAGNAC" in the United States on "products including, but not limited to, alcoholic and nonalcoholic beverages and food products," which license was to be assignable by Mr. Golman "to any corporation of which Mr. Golman owns 100% of the stock on the date of assignment." The agreement also provided that applicant would turn over its customer lists to Mr. Golman; provide him with a chemical analysis and brief description of the production process for "COLAGNAC" cola liqueur; and assist him in purchasing the product from the Spanish producer. Mr. Golman never imported any of the product or made any sales thereof. Instead, effective December 31, 1984, he assigned all of his rights under the agreement with applicant to George Golman Spirits, Inc., a corporation wholly owned by Mr. Golman. That company never imported any of the product or made any sales thereof either, and in a letter dated November 29, 1985, Mr. Golman terminated the agreement with applicant, stating in part as

10

follows:

> ... Despite my extensive efforts to develop market demand for the product, I have been unable to sell the concept. In the process of developing the product and the market, I have spent considerable amounts of time and money with no results. It is apparent that after one year, the time is not right and the market is not ready for Colagnac. My company and I will no longer use the tradename [sic] Colagnac in any manner and we hereby surrender to you any and all rights to use the tradename [sic].
>
> I wish this deal could have worked for our mutual benefit, but I just cannot afford to keep spending money on a product that shows no promise of yielding a reasonable return.

Applicant has not licensed the right to use the mark "COLAGNAC" to anyone else and has no plans to do so. When questioned as to whether applicant had any plans to import the "COLAGNAC" product again itself, applicant's president, Mr. Herman Philipson, Jr., responded, "It depends on the outcome of this matter." In short, there have been no sales or advertisements of the "COLAGNAC" product in the United States, either by applicant or by a licensee of applicant, since September of 1984. From its formation in 1979 until the time of the sale of certain of its assets to Mr. George Golman, applicant was engaged solely in the business of importing and distributing alcoholic beverages, and had as many as 12 to 15 employees. Since at least as early as May 1, 1985, applicant has been engaged solely in the investment banking business, and its only employee is its president, Mr. Philipson.

11

The record also indicates that Mr. Philipson chose the mark "COLAGNAC" for the cola liqueur because he thought the mark would suggest that the product contained cola and because, according to Mr. Philipson, "GNAC" is "a very common ending used on a variety of different alcoholic beverage products." When pressed for examples, Mr. Philipson said he could only think of Armagnac, Salignac, and Cognac.[2]

Finally, the record shows that on March 1, 1984, the BATF issued a temporary certificate of label approval for applicant's "COLAGNAC" label;[3] that applicant owns a French registration (No. 1.359.255 issued December 9, 1985, a date after the commencement of this proceeding) for the mark "COLAGNAC" for "liqueurs and spirits (except brandies)"; and that as of early 1987, at the request of opposer Bureau, the French Administration and the French National Institute of Appellations of Origin, acting in liaison, were preparing an action requesting cancellation of applicant's French registration.

Turning first to the matter of standing, each opposer has introduced evidence which clearly demonstrates its real interest in this case (opposer Bureau by reason of its legal

_____
(2) The term "Armagnac" is defined in Webster's New World Dictionary (Second College Edition 1986) as "brandy distilled from wine in the district of Armagnac in Gascony, France." One of the articles made of record by opposer Bureau indicates that "Salignac" is a brand name for a "Cognac" brandy.
(3) The certificate was stamped "operative only until 6/1/84." Applicant never obtained any further certificate of label approval.

12

duty to oversee the production and sale of "COGNAC" brandy and to protect the significance of the designation "COGNAC" as an appellation of origin for brandy, and opposer Schieffelin by reason of its importation and sale of "COGNAC" brandy in the United States), and hence its standing. Cf. Jewelers Vigilance Committee, Inc. v. Ullenberg Corp., 823 F.2d 490, 2 USPQ2d 2021 (CAFC 1987), and cases cited therein.

Before turning to a consideration of the various grounds for opposition asserted by the opposers, we believe that a discussion of the significance of the designation "COGNAC" is in order. We start by noting that Section 45 of the Trademark Act of 1946, 15 U.S.C. 1127, defines the term "certification mark" as "a mark used upon or in connection with the products or services of one or more persons other than the owner of the mark to certify regional or other origin, material, mode of manufacture, quality, accuracy or other characteristics of such goods or services...." That same section defines the term "mark" as "any trademark, service mark, collective mark, or certification mark entitled to registration under this Act whether registered or not" (emphasis added). Section 4 of the Act, 15 U.S.C. 1054, provides for the registration (subject to the provisions relating to trademarks, so far as they are applicable) of certification marks, including indications of regional origin used in commerce, "by persons, and nations, States, municipalities, and the like, exercising legitimate control over the use of the marks sought to be registered." Section 2(e)(2) of the Act, 15 U.S.C. 1052(e)(2), which

13

prohibits the registration of a mark which, when applied to the goods of the applicant, is primarily geographically descriptive or deceptively misdescriptive of them, contains an express exception for indications of regional origin registrable under Section 4. Further, we have held that an opposer may rely upon common law rights in a certification mark. See: Stabilisierrungsfonds fur Wein v. Zimmermann-Graeff KG, 199 USPQ 488 (TTAB 1978). Cf. State of Florida v. Real Juices, Inc., 171 USPQ 66 (DC MD Fla 1971).

In the present case, we believe it is clear that the designation "COGNAC" serves as a certification of regional origin, as well as of the quality of the brandy products entitled to bear the designation under French laws and regulations, which quality results from the use of the required type of grape, methods of distillation, aging conditions, etc. Moreover, under French law, opposer Bureau is responsible for certifying the genuineness of brandy bearing the designation "COGNAC" and for protecting the designation "COGNAC" as an appellation of origin. Under the circumstances, we are of the opinion that (as contended by opposer Bureau in its brief on the case) the term "COGNAC" is a common law regional certification mark controlled (but not used) by opposer Bureau (and that opposer Bureau is therefore entitled to rely upon it herein for purposes of its allegation of likelihood of confusion under Section 2(d) of the Act). Cf. Community of Roquefort v. William Foehndrich, Inc., 303 F.2d 494, 133 USPQ 633 (CA2 1962).

14

We turn next to the grounds for cancellation asserted by the opposers, beginning first with the ground of deceptiveness. The Board has held that a mark is deceptive within the meaning of Section 2(a) of the Act, 15 U.S.C. 1052(a), if it misdescribes the goods, purchasers are likely to believe the misrepresentation, and the misrepresentation would materially affect their decision to purchase the goods. See: In re Quady Winery Inc., 221 USPQ 1213 (TTAB 1984). If the mark misdescribes the goods, and purchasers are likely to believe the misrepresentation, but the misrepresentation is not material to the purchasing decision, then the mark is deceptively misdescriptive. See: In re Quady Winery, Inc., supra. In the same vein, if a mark is the name of a place known generally to the public, purchasers who encounter goods bearing the mark would think that the goods originate in that place [i.e., purchasers would make a "goods-place association," as the Court of Customs and Patent Appeals put it in In re Nantucket, 677 F.2d 95, 213 USPQ 889 (1982)], the goods do not come from the named place, and the deception is material to the purchasing decision, the mark is deceptive under Section 2(a); if the deception is not material to the purchasing decision, the mark is primarily geographically deceptively misdescriptive under Section 2(e)(2) of the Act. See: In re House of Windsor, Inc., 221 USPQ 53 (TTAB 1983). Cf. In re Nantucket, supra, and In re Loew's Theaters, Inc., 769 F.2d 764, 226 USPQ 865 (CAFC 1985).

15

Of particular significance to the determination of the issue of deceptiveness in this case is a decision of the Court of Customs and Patent Appeals in the case of Otard, Inc. v. Italian Swiss Colony, 141 F.2d 706, 61 USPQ 131 (1944), and in eleven cases consolidated therewith. The twelve cases arose out of two applications filed by Italian Swiss Colony for registration of the marks "CALOGNAC" and "COLOGNAC" for brandy. The brandy sold under the marks was produced from grapes grown in California. Each application was opposed by six importers and distributors in the United States of "COGNAC" brandy. The opposers did not claim any rights in "COGNAC" as a mark,[4] or dispute applicant's right to use the terms "CALOGNAC", "COLOGNAC", and/or "COGNAC" on brandy which was in fact "COGNAC" brandy, i.e., French brandy produced from grapes grown in the Cognac region of France. What the opposers did assert as grounds for opposition was that there was such similarity between the term "COGNAC", on the one hand, and "CALOGNAC" and "COLOGNAC", on the other, that people would purchase applicant's brandy sold under its marks in the

_____
(4) It should be noted that these cases arose under the Act of 1905, and were finally decided more than two years prior to the enactment of the Trademark Act of 1946, wherein certification marks were "created" as a legal concept and were accorded legal recognition and protection. It should also be noted that the 1905 Act did not include a specific prohibition, such as that included in Section 2(a) of the Act of 1946, against the registration of deceptive marks, but did prohibit the registration of "words or devices which are descriptive of the goods with which they are used, or of the character or quality of such goods, or merely a geographical name or term."

16

mistaken belief that the brandy was "COGNAC" brandy, with the result that opposers might lose sales of their "COGNAC" brandy and so suffer damage. The issue in the cases was framed by the Commissioner, in his opinion in one of the oppositions involving the mark "CALOGNAC", at 54 USPQ 268, 269 (1942), as follows:

> It seems to me the only question requiring determination is whether it appears reasonably likely that people seeing the name "Calognac" on brandy will believe the brandy to be cognac; in other words whether "Calognac" will be reasonably likely to impress purchasers and the public as merely a corruption or a mere misspelling of the word "cognac" and to mean nothing else but cognac either descriptively or geographically or both;....

The Commissioner answered this question (and similar questions in the other eleven cases) in the negative because of the differences between the term "COGNAC", on the one hand, and "CALOGNAC" and "COLOGNAC", on the other. On appeal to the Court of Customs and Patent Appeals, opposers argued, as reported at pages 134-135 of the Court's opinion, that

> ... Cognac as a name has attained a world-wide secondary meaning as solely indicating a brandy produced in or emanating from the Cognac district of France; that brandies distilled elsewhere are not legally entitled to be designated as Cognac;... that "Calognac" is a mere obvious corruption of "Cal. Cognac," and that it is "unregistrable as being descriptive or misdescriptive as applied to domestic brandy;" that it is calculated to confuse and deceive purchasers "in the absence of any showing in the record that applicant's brandy is imported genuine Cognac brandy," and that it would "falsely indicate the origin of applicant's brandy."

17

The Court reversed the decision of the Commissioner for the following reasons, as expressed in its opinion with respect to the application to register "CALOGNAC", at page 136:

> We have no quarrel with the Commissioner's assumed pronunciation of the respective words, although "Calognac" being a coined term any pronunciation of it would be more or less a matter of individual choice, but pronunciation, as we view it, is not an important - certainly not a controlling - factor here. The application for its registration does not divide the term into syllables. The first letter of it, and the last four letters are identical with similar letters of Cognac. If the next two letters (A and L) were eliminated there would remain only the word Cognac. Certainly, the terms are quite similar in appearance. We are unable to escape the conclusion that appellee, whatever its motive, in trying to establish a trade mark sought one as nearly like Cognac as it could find or coin, and in adopting "Calognac" it certainly made a close approach.

The Court accordingly held that all twelve oppositions should be sustained, noting, with respect to the application to register "COLOGNAC", that that term was even closer than "CALOGNAC" in its resemblance to the term "COGNAC".

We believe that the same is true of the present applicant's mark, "COLAGNAC", that is, that it is even more similar to the term "COGNAC" than was the term "CALOGNAC". Accordingly, we conclude that purchasers who encounter applicant's cola liqueur bearing the mark "COLAGNAC" are likely to believe that the mark is a misspelling of "COGNAC" or a combination of the terms "Cola" and "COGNAC" and hence that applicant's product contains "COGNAC" brandy, i.e., brandy made from wines produced from grapes grown in the Cognac region of

18

France in accordance with French laws and regulations, when in fact applicant's product contains not "COGNAC" brandy but rather a Spanish brandy. In view thereof, and since there can be no doubt (because of the renown of "COGNAC" brandy) as to the materiality of the deception to the purchasing decision, we are of the opinion that applicant's mark, as applied to its goods, is deceptive within the meaning of Section 2(a) of the Act.[5] The facts that applicant obtained a temporary certificate of label approval for its "COLAGNAC" label from the BATF, and that applicant's labeling states that its product is "produced and bottled in Spain," can be of no benefit to applicant in this regard.[6] See: American Meat Institute v. Horace W. Longacre, Inc., 211 USPQ 712, at 721-722 and 723 (TTAB 1981), and cases cited therein.

Turning next to the prior use and likelihood of confusion ground for opposition asserted by opposer Bureau,[7]

_____
(5) Although we believe that there is no doubt as to the materiality of the deception, so that the mark is deceptive within the meaning of Section 2(a), we note that if the deception were not material, the mark would be deceptively misdescriptive and thus fall within the prohibition of Section 2(e)(2).
(6) Indeed, as noted by opposer Bureau in its brief, the label could reasonably be construed as meaning a product mixed and bottled in Spain which nevertheless contained "COGNAC" brandy.
(7) The ground is available to opposer Bureau because Section 2(d) of the Act, 15 U.S.C. 1052(d), prohibits, inter alia, the registration of a mark "which so resembles... a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive" (emphasis added), and as noted above, Section 45, 15 U.S.C. 1127, defines the term "mark" as including, inter alia, a certification mark, "whether registered or not."

the evidence of record establishes that the term "COGNAC" has been used in the United States and in France by persons other than opposer Bureau, but under that party's control, as a common law certification mark since long prior to applicant's use of the mark "COLAGNAC". Moreover, applicant's identification of goods, "liqueurs," encompasses brandy liqueurs; the product on which applicant actually uses its mark contains both brandy and cola; the evidence shows that "COGNAC" brandy may be mixed with soft drinks, including cola drinks, to form a cocktail; and applicant's "liqueurs" and "COGNAC" brandy are products likely to be sold through the same channels of trade to the same classes of purchasers (in fact, the record contains a copy of the newspaper advertisement run by the Texas retailer to whom applicant sold 99 cases of its product, wherein both "COGNAC" brandy and "COLAGNAC" liqueur are featured). It is apparent therefrom that "COLAGNAC" liqueurs and "COGNAC" brandy are very closely related products. In view thereof, and because of the similarities between the mark "COLAGNAC" and the certification mark "COGNAC",[8] we conclude that the mark "COLAGNAC" so resembles the certification mark "COGNAC" as to be likely, when applied to the goods of the applicant, to cause confusion, mistake, or

_____
[8] We believe that the marks here are more similar than were the terms "CALOGNAC" and "COGNAC" in the Otard, Inc. v. Italian Swiss Colony case discussed above, both in appearance and in sound. Here, unlike in that case, the marks are susceptible to very similar pronunciations.

20

deception among purchasers, that is, to cause them to mistakenly believe that applicant's product is, or contains, authentic "COGNAC" brandy (i.e., brandy which has been certified by opposer Bureau as having been produced from grapes grown in the Cognac region of France in accordance with French laws and regulations).

This brings us to the final ground for opposition asserted by opposers, namely, the ground of abandonment through uncontrolled licensing and through nonuse with no intent to resume use. As to the assertion of abandonment by uncontrolled licensing, it is true that the written license agreement between applicant and Mr. Golman contained no provisions for the exercise of control by applicant over the quality of the goods to be sold under the mark, and that the license was not limited to specific goods, but rather covered "products including, but not limited to, alcoholic and nonalcoholic beverages and food products." Although these factors are suggestive of uncontrolled licensing, what is determinative in such cases is whether the licensor does in fact exercise control over the quality of the goods sold by the licensee under the mark. See: J. Thomas McCarthy, Trademarks and Unfair Competition, §18:17D at pages 845-846 (Second Edition 1984), and cases cited therein. In the present case, however, the licensee never ordered or sold any goods under the licensed mark at all; hence, there was never any need or opportunity for applicant to exercise quality control. Moreover, it must be remembered that abandonment through uncontrolled licensing is a

21

charge which must be proved by clear and convincing evidence.
See: Winnebago Industries, Inc. v. Oliver & Winston, Inc., 207
USPQ 335 (TTAB 1980). Under the circumstances in this case, we
cannot say that there was an abandonment due to licensing
without quality control.

We come to a different conclusion, however, with
respect to opposers' allegation of abandonment by reason of
nonuse since September 27, 1984 with no intent to resume use.
Section 45 of the Statute, 15 U.S.C. 1127, provides in part
that a mark shall be deemed to be abandoned

> (a) When its use has been discontinued with
> intent not to resume. Intent not to resume
> use may be inferred from circumstances.
> Nonuse for two consecutive years shall be
> prima facie abandonment.

There had not been two consecutive years of nonuse
either at the time when opposers filed their amended notices of
opposition (in May 1986 for Opposition No. 72,088 and in June
1986 for Opposition No. 72,105) wherein they added abandonment
as a ground for opposition, or at the time of the taking of the
discovery deposition (on May 14, 1986) which serves as the
evidentiary basis for opposers' charge of abandonment. Hence,
quite naturally, opposers' pleadings of abandonment make no
assertion of abandonment based on nonuse for two consecutive
years. In fact, the two-year period immediately following
applicant's last use of its mark on September 27, 1984 did not
expire until just a few days prior to the close of opposers'
testimony period on October 1, 1986. Thus, opposers are not
entitled to assert nonuse for two consecutive years as a basis

22

for their charge of abandonment. See: P.A.B. Produits et Appareils de Beaute v. Satinine Societa in Nome Collettivo di S.A. e.M. Usellini, 570 F.2d 328, 196 USPQ 801 (CCPA 1978).

Nevertheless, we agree with opposers that the circumstances in this case are such as to warrant a finding of abandonment through nonuse with no intent to resume use. The cessation of use of the mark in September of 1984, with no further use thereof thereafter either by applicant or its licensee; applicant's divestiture, in the same month, of the assets of its alcoholic beverages business; applicant's subsequent change to a completely different business, namely, the investment banking business, in which the "COLAGNAC" mark was not used; the apparent lack of a market for the "COLAGNAC" product; applicant's reduction from the 12 to 15 employees it had when it was in the alcoholic beverages business, to a single employee, its president; and applicant's lack of any plans for resumption of use of the mark on liqueurs, either itself or through licensees, all lead us to conclude that the mark has been abandoned through nonuse with intent not to resume.[9]

Turning next to applicant's pleaded defenses of laches and estoppel based on opposers' asserted failure to object to a

_____

[9] Opposers also argue in their briefs that applicant's use of the mark "COLAGNAC" was insufficient to create any trademark rights therein. Aside from the fact that we disagree, this ground for opposition was neither pleaded, nor tried with the express or implied consent of applicant, and hence can be given no consideration herein.

23

registration for "COLAGNAC" which was allegedly issued to applicant under the Trademark Act of 1938 of Great Britain and Northern Ireland, applicant offered no evidence in support of its claim to such a registration. Applicant did offer into evidence a copy of a registration for the mark issued to applicant in the country of France. However, that registration did not issue until after the commencement of this proceeding. In any event, an applicant's ownership of a foreign registration of its mark is immaterial to applicant's right to register the mark in the United States; similarly, an opposer's right to object to the registration of a mark in the United States is independent of whatever foreign trademark rights the parties may have. See: Nabisco, Inc. v. George Weston Ltd., 179 USPQ 503 (TTAB 1973), and William Sanderson & Son Ltd. v. Fernandes & Co. Ltd., 137 USPQ 165 (TTAB 1963). Accordingly, applicant's asserted defenses of laches and estoppel are not well taken.

Nor do we find persuasive applicant's asserted defense that the designation "COGNAC" is merely descriptive of geographic origin and thus is entitled to no protection. Obviously, this is not a legally sufficient defense to either the deceptiveness or (given opposers' standing) the abandonment grounds of opposition. Nor is it a sufficient defense to opposer Bureau's Section 2(d) prior use and likelihood of confusion ground for opposition, because "COGNAC", the mark relied on by opposer Bureau for purposes of this ground, is a certification mark which serves as an indication of regional

24

origin. As noted above, such marks are specifically excluded by Section 2(e)(2) of the Statute from the prohibition against the registration of a mark which, when applied to the goods of the applicant, is primarily geographically descriptive or deceptively misdescriptive of them.

In summary, we conclude that both oppositions must be sustained on the grounds of deceptiveness and abandonment through nonuse with intent not to resume use, and that Opposition No. 72,088 must also be sustained on the Section 2(d) ground of prior use and likelihood of confusion.

Decision: The oppositions are sustained, and registration to applicant is refused.

J. D. Sams

J. E. Rice

R. L. Simms
Members, Trademark
Trial and Appeal Board

25

MAR 17 1988